The **MACHLETT LABORATORIES, INC.**, Plaintiff-Appellee,

v.

**TECHNY INDUSTRIES, INC.**, C. William Vatz, Leonard Bezark, Jr., and James R. Craig, Defendants-Appellants.

No. 81–1759.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1981.

Decided Dec. 8, 1981.

Rehearing and Rehearing En Banc Denied Feb. 4, 1982.

Selwyn Zun, D'Ancona, Pflaum, Wyatt & Riskind, Chicago, Ill., for defendants-appellants.

Rueben L. Hedlund, Hedlund, Hunter & Lynch, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and DUMBAULD, Senior District Judge.*

CUMMINGS, Chief Judge.

This is an appeal by Techny Industries, Inc. and its three founders, Messrs. Vatz, Bezark, and Craig, from a preliminary injunction issued by the district court to prevent their manufacture and sale of "any x-ray equipment" pending trial (Order at 2; Tr. at 808–809, 816). We reverse the order of the district court granting the preliminary injunction and remand for trial pursuant to Circuit Rule 18.

## I

In early 1978, Vatz, Bezark, and Craig sold the business they had formed, Amrad, Inc., to The Machlett Laboratories, Inc. ("Machlett"). Prior to the time of sale, Amrad manufactured and sold stationary x-ray units and related components. In late 1979, Vatz, Bezark, and Craig formed a new company, Techny Industries, Inc. ("Techny"), which now manufactures mobile x-ray units. Machlett brought this lawsuit against Techny and its founders based in part upon the alleged breach of a covenant not to compete included in the sale agreement.[1] Machlett then requested the preliminary injunction at issue here, alleging that irreparable damage would result from the defendants' further competition with Machlett in the form of injury to the Amrad goodwill Machlett had purchased and injury to relationships with dealers of Amrad's x-ray equipment. Part of the Amrad business sold to Machlett was an established dealer network, and Techny had begun to solicit sales of its mobile x-ray unit from some of the same dealers.[2] The district court granted the requested preliminary injunction but allowed Techny to complete sales of approximately 150 mobile x-ray units already contracted for.

## II

The standard for granting a preliminary injunction is well known. The plaintiff must show that: (1) it has at least a reasonable likelihood of success on the mer-

* The Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, is sitting by designation.

1. The ten-year covenant not to compete provided that the individual defendants would not "engage * * * in any business directly or indirectly competing with any of the business activities being carried on by The Machlett Laboratories, Inc. as successor to Amrad, Inc."

2. Machlett has also alleged other forms of competitive injury, for example, that Techny hired away several of its key employees. Since those injuries, if suffered, have already occurred and the only purpose of a preliminary injunction is to preserve the *status quo*, we do not consider these other alleged injuries relevant to the issues involved in this appeal.

its, (2) it has no adequate remedy at law and will otherwise be irreparably harmed, (3) the threatened injury to it outweighs the threatened harm the preliminary injunction may cause the defendants, and (4) the granting of the preliminary injunction will not disserve the public interest. *O'Connor v. Board of Education of School District No. 23*, 645 F.2d 578, 580 (7th Cir. 1981); *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). We need not consider whether Machlett has shown a reasonable likelihood of success on the merits because it failed to prove the other three requirements.[3] Of course, this Court "can reverse the grant of a preliminary injunction only if 'the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion.'" *O'Connor*, 645 F.2d at 580 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–932, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648). However, when as in this case the district court merely adopts verbatim the findings and conclusions of the prevailing party "they may therefore be more critically examined." *Garcia v. Rush-Presbyterian-St. Luke's Medical Center*, 660 F.2d 1217 at 1220 (7th Cir. 1981); see also *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 731 (7th Cir. 1979), certiorari denied, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601.[4] For the following reasons, we conclude that the district court abused its discretion by granting this preliminary injunction.

Machlett has not shown that it cannot be compensated with monetary damages if Techny's continued manufacture and sale of mobile x-ray equipment is not enjoined and is found to violate the covenant not to compete. To the contrary, the district court found "that the plaintiff can accurately arrive at money damages that it has sustained and will sustain from the manufacture and sale" of the approximately 150 units exempted from the preliminary injunction (Tr. at 797). Although such exceptions to a preliminary injunction may not always evidence an abuse of discretion by the district court, there has been an abuse of discretion here absent some further showing of why the injury caused by 150 units is compensable while the injury caused by some larger volume is not. There was no proof of any qualitative difference between the alleged injury due to a sale of 150 units and the injury that would be due to a sale of a greater number of units. There was no proof, for example, that the quantitatively larger injury would so deplete Machlett's resources or diminish its standing in the x-ray market that it would be unable or without profit to prosecute the lawsuit through to trial. See *Fox Valley Harvestore*, 545 F.2d at 1098. Machlett cites *Reinders Bros. v. Rain Bird Eastern*

---

**3.** Although reasonable likelihood of success on the merits is a crucial prerequisite to a preliminary injunction, it cannot be used to elevate the preliminary injunction hearing into a trial. The district court must also consider whether some legal remedy will compensate for any extra injury occurring between the preliminary injunction and trial, what harm the preliminary injunction may cause the defendants, and any disservice to the public interest that may be caused by the preliminary injunction. To the same effect, the factual predicate of a preliminary injunction and any reviewing court dicta concerning the facts "do not bind [the district] court in the subsequent trial on the merits." *Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164, 167 (7th Cir. 1981).

Without deciding reasonable likelihood of success on the merits, it may be noted that the covenant forbids only competing with activities "*being* carried on" by Machlett "as successor" to Amrad. Therefore arguably no permanent injunction resulting in complete distruction of the new business should be granted until after clear proof that the new business is one that Machlett and Amrad were both carrying on at the time of the covenant. But as stated in note 1 of the dissent, the resolution of this matter is left for the district court.

**4.** Judge Pell's dissent relies on facts derived from the proposed findings of fact prepared by counsel for Machlett and submitted to Judge Perry after he had decided to grant the preliminary injunction. Subsequently he entered those findings of fact (plus Machlett's counsel's modifications in one finding and one conclusion of law and the addition of two findings) as his own without reading them (Tr. 843). In sum, the adopted findings of fact and conclusions of law were verbatim Machlett's.

*Sales Corp.*, 627 F.2d 44, 53 n.7 (7th Cir. 1980) for the proposition that even a small injury to goodwill may not be compensable in monetary damages. But the alleged injury to goodwill, if any, has already occurred—Techny has already designed a mobile x-ray unit, already contacted members of Machlett's dealer network, etc.—and the argument that this injury is continuing or aggravated and therefore irreparable is inconsistent with the district court's finding of no irreparable injury from a sale of the first 150 units. In short, there has been no showing that Machlett cannot be compensated through monetary damages for any of its alleged injuries suffered prior to trial.

■ The balance of hardships also does not favor Machlett. Counsel for Machlett conceded at oral argument that the preliminary injunction will put Techny out of business when Techny completes delivery of the 150 units in February 1982. On the other hand, if the preliminary injunction is vacated and Machlett's theory of the case is correct, Machlett at worst will be forced to compete with Techny pending trial. The latter injury, which is uncertain because it rests on whether mobile and stationary x-ray machines in fact compete, is plainly outweighed by the certain injury to Techny of going out of business, and therefore it must be deemed an abuse of discretion to find the opposite. Compare *Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164, 167 (7th Cir. 1981) (under balance of harms test certain dealership termination would be more destructive than possible competitive injuries).

■ Finally, the preliminary injunction will disserve the public interest in health care and in low-cost health care. Machlett's brief (at 5) states that Vatz, Bezark, and Craig "each * * * had developed outstanding reputations as 'pioneers' during their many years in the [x-ray diagnostic] industry." Craig, in particular, "had a world-wide reputation as an x-ray engineer and inventor." The preliminary injunction would prevent the trio from working in any x-ray business and thus inhibit their further contributions to x-ray medicine. By preventing Techny from further sales of its

mobile x-ray unit, the preliminary injunction does not block new medical research but does reduce competition in mobile x-ray equipment, the import of which can be explored at trial. Consequently, the public interest in the low cost of health care is also disserved insofar as reduced competition would probably increase the price of mobile x-ray machines.

### III

The preliminary injunction is vacated as improvidently granted, and the cause is remanded for trial pursuant to Circuit Rule 18. Techny is ordered to continue to segregate and separately retain its profits from the sale of mobile x-ray equipment until final judgment is entered by the district court on remand or until the dispute is settled.

PELL, Circuit Judge, dissenting.

Appellate review of the broad discretion accorded to a district court in deciding whether to grant injunctive relief is very limited, *Sangmeister v. Woodard*, 565 F.2d 460, 465 (7th Cir. 1977), *cert. denied*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978). On appeal, the decision of the trial court may be overturned, "only upon a showing of a clear abuse of discretion." *Reinders Brothers, Inc. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 49 (7th Cir. 1980); *Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). Moreover, this court has established that

> discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*American Medical Association v. Weinberger*, 522 F.2d 921, 924 (7th Cir. 1975) (emphasis added) (quoting *Particle Data Laboratories, Inc. v. Coulter Electronics, Inc.*, 420 F.2d 1174, 1178 (7th Cir. 1969)).

Thus, the appellants in the present case have come to this court on appeal with an extremely heavy burden. On the basis of the record brought to us I do not think the

appellants have met their burden and I therefore respectfully dissent.

It is not the province of this court to determine whether we as an initial matter would or would not have granted a preliminary injunction. Nor should we sit in judgment on a de novo basis. Rather, as indicated above, our examination is limited to whether on the record before it the district court clearly abused its discretion. For my analysis I find it necessary to set out somewhat more fully than appears in the majority opinion, the facts which were developed during the six-day hearing before the district court. Those facts were found by the court and are supported by substantial evidence presented to the trial judge who had the opportunity, which we do not have, of making determinations in a substantial part based upon the credibility of witnesses who testified. The court heard testimony from each of the principals involved in this litigation as well as from x-ray dealers and experts called by each side. Those facts are as follows.

Francis Heintz, the president of Machlett, learned in late 1977 that Amrad, Inc. (Amrad) which was owned in equal shares by the appellants, Vatz, Bezark, and Craig, was for sale. Vatz had been the president of Amrad and as its head of marketing had developed a large dealer network for the distribution of x-ray equipment. Bezark was the general manager and supervised the manufacturing operation. Craig who served as chief engineer had a world-wide reputation as an x-ray engineer and inventor. Machlett thus had an opportunity to enter the diagnostic x-ray equipment business by purchasing a company with an established reputation, a strong dealer network, and substantial expertise in marketing, manufacturing, and engineering.

Negotiations between Heintz on the one hand and Vatz, Bezark, and Craig on the other began in 1977. During the numerous meetings between Heintz and the individual appellants there were discussions of the introduction by Amrad of a mobile x-ray unit. Heintz was informed at these meetings that work had been done on a self-contained x-ray head which, when completed, could be used as a key element of a mobile x-ray unit. At one point Heintz had been provided a written projection showing the introduction by Amrad of a mobile x-ray unit in 1980 with sales projected in that year of $400,000 and sales in 1981 of $700,000. Machlett used both of defendants' projections to estimate future profits and losses and to calculate a purchase price for Amrad. Projections of the future profits and possible losses were presented by Heintz to the Raytheon board of directors in connection with the acquisition of Amrad. The board subsequently approved the purchase and on February 27, 1978, Machlett and the individual appellants closed the sale of the business of Amrad for approximately 7.7 million dollars.

As a part of the transaction, Vatz and Craig were hired as full-time consultants to Machlett, and Bezark was hired as general manager of Amrad. All three of the individual appellants promised that for ten years they would not

> engage ... in any business directly or indirectly competing with any of the business activities being carried on by The Machlett Laboratories, Inc. as successor to Amrad, Inc.[1]

The last one million dollars of the purchase price was to be held in escrow until August 1979 and then paid to defendants if no claims had been asserted against Amrad. While the individual appellants were with Amrad after the purchase they continued to

---

1. In the final paragraph of footnote 3, the majority opinion essays at an interpretation of the covenant with which I cannot agree. It seems clear to me that refraining from competition if keyed only to the precise business "being" carried on at the moment of the execution of the covenant is both unrealistic and not that which was contemplated by the parties. The covenant contemplated a *ten year period* of non-competition, either directly or indirectly. The interpretation given by the majority would permit the defendants to enter the market with a new model stationary x-ray unit. The majority gloss raises and addresses an issue which was neither briefed nor argued. Under this circumstance, the scope of the covenant, it seems to me, should properly be left to the district court on remand.

project the introduction of mobile x-ray units.

In August 1979 Vatz, Bezark, and Craig received the final one million dollars. Within two days Bezark and Vatz asked to be let out of their employment and consulting contracts. Their final day of work for Amrad was October 29, 1979. Bezark indicated that he "planned to do a lot of traveling, learn to play the piano," but Vatz said nothing of his future plans. Craig did continue for a while as a full-time consultant to Amrad although on November 1, 1979 the three individuals formed defendant Techny Industries, Inc. (Techny). They previously had located office space for this business although none of the appellants informed Heintz or anyone else at Machlett of their intention to form Techny. They did consult their lawyers as to whether the manufacture and sale of mobile x-ray units would violate their covenants not to compete but never asked Machlett this question, considering the project to be "confidential."

The first technical description of the Techny unit was written by Craig who, at the time he did so, was under a full-time consulting contract with Amrad. After the technical description was completed, the appellants asked James Princehorn, an electrical engineering manager of Amrad, to work for them, and once they were ready to begin production they hired Carl Wassell, formerly the manufacturing manager of Amrad; Dennis Amore, Amrad's mechanical assembly foreman; and Hector Rovira, a group leader in the Amrad machine shop. They also attempted to hire a senior mechanical engineer but were refused by that individual.

At the time that the Techny mobile unit was ready to market, Vatz took over and solicited the same dealers for Techny that he had called on while he was with Amrad. Every dealer appointed by Techny was an Amrad dealer and included the top three Amrad dealers of 1980 and seven of the top Amrad dealers of 1977. As late as February 1981 when Craig terminated his consulting agreement with Amrad he said that he was leaving to spend time in the mountains and to work on his 1950 Ford but said nothing of his work at Techny.

The hiring of key Amrad employees had a severe impact upon Amrad's engineering and development programs, and delayed Amrad's internal development of a mobile x-ray machine. In this respect it is to be noted that Craig's consulting agreement with Amrad provided that all original works of authorship which he produced or composed as part of his services belonged to Machlett. By August 1980 Machlett began to explore the possibility of marketing mobile x-ray units purchased from a Japanese manufacturer. A purchase was consummated early in 1981 when ten units were ordered from the Japanese source which were to be marketed through Amrad's dealer network in competition with the Techny units which are in the same marketplace.

While there are basic differences between the stationary x-ray equipment and the mobile units, their fundamental purpose in each instance is to produce x-ray film for diagnostic purposes. Both mobile and stationary units are used to take radiographs of the extremities, the chest, the spine, and by veterinarians of animals. In sum, there was substantial evidence that the units competed for sales and were often used interchangeably although the amount of money available to hospitals for the purchase of x-ray equipment is relatively fixed. Amrad and Techny will be competing for those dollars.

At the conclusion of the hearing on the basis of a record consisting of eight hundred pages of hearing transcript, four hundred pages of deposition transcript, and seventy exhibits, the district court announced oral findings of fact, including the following:

> I find that the plaintiff has proved that there is likelihood of success, that all of the defendants are now actively engaged in competing with the plaintiffs in the manufacture and sale of a mobile x-ray unit both directly and indirectly and competing with the plaintiff.

I find that the mobile unit is interchangeable with the stationary unit, and all of which is contrary to the defendants' covenant not to compete and signed by the defendants.

I find that irreparable damage will result from this competition of the defendants if the defendants are not restrained from such competition.

I find that the public will in no way suffer as a result of any injunction prohibiting such competition by defendants.

I find that the balance of the equities are with the plaintiff. Therefore, the motion for an injunction will be and is hereby granted.

These oral findings of fact cover and meet the standard for granting a preliminary injunction as outlined in part II of the majority opinion. The district court did have counsel submit findings of fact but noted on three separate occasions that the plaintiff would have to modify its proposed findings to include some matters not in the findings of fact submitted by the counsel. The plaintiff did so. I find no support in the record for the majority opinion's statement that here the district court "merely" adopted verbatim the findings and conclusions of the prevailing party.

The juxtaposition of the treatment of this matter in the majority opinion would seem to suggest that because the court had counsel submit proposed findings of fact the court therefore concluded that the district court abused its discretion by granting a preliminary injunction. If this is intended to be the result, it is the first case to my knowledge in which this court has used the adoption of proposed findings of fact prepared by the prevailing party as a basis for reversal. It is true, as pointed out in *Garcia v. Rush-Presbyterian-St. Luke's Medical Center,* 660 F.2d 1217 (7th Cir. 1981), the latest word on the subject in this circuit, that the practice has been criticized by this court. On the other hand no judge can have sat on this court for many years without being aware that the practice is relatively common among district court judges, a practice necessitated by the sheer volume of paper work confronting the trial courts. As *Garcia* points out, at p. 1220, the adoption does not invalidate the findings, "although they may therefore be more critically examined." The *Garcia* opinion then proceeds to state that the "proper standard of appellate review of the trial court's findings of fact is that the findings will not be disturbed unless 'clearly erroneous,'" citing Fed.R.Civ.P. 52(a) and early authorities from this court.

With all due respect, nowhere do I find in the majority opinion a convincing demonstration that any of the findings of fact were clearly erroneous.

Of the four prongs of the standard for granting a preliminary injunction as outlined in the majority opinion, I regard the most important that of being whether the proponent of the preliminary injunction has demonstrated at least a reasonable likelihood on the merits. The majority opinion has seen fit not to consider the reasonable likelihood of success. It appears to me that little more is needed than a statement of the facts which have been outlined above to show that Machlett has demonstrated a reasonable likelihood of success on the merits.

While it is true that in this court the appellants raise, or attempt to raise the issue of the enforceability of the covenants, for the present purpose of review of the granting of the preliminary injunction, this issue must be regarded as having been waived because it is raised for the first time on appeal. A recent authority of this court on that matter is *Pinto Trucking Service, Inc. v. Motor Dispatch, Inc.,* 649 F.2d 530 (7th Cir. 1981). In any event, another recent case of this court, *Lektro-Vend Corp. v. The Vendo Co.,* 660 F.2d 255 (7th Cir. 1981), is authority that the covenants are enforceable.

On the question of irreparable harm to the plaintiff, the majority opinion finds its principal support in the fact that the district court permitted the sale of the one hundred fifty units to proceed with compensation to be paid to the plaintiff. The district court, however, was sitting in an equity capacity and recognized that with

regard to the one hundred fifty units previously sold by the defendants, most of the irreparable damage to Machlett already had been accomplished. The court obviously believed that with regard to these units only, permitting the defendants to complete their sales and requiring them finally to turn over those profits to plaintiff, would not result in substantial additional irreparable injury over and above that which had already occurred. As the plaintiff itself in candor states, it would have preferred that the defendants had been barred from completing their sales of the one hundred fifty units but respected the broad latitude of the trial court in shaping injunctive relief, citing *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978); *Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).

Further, in exercising its equity powers the district court tailored its order of preliminary injunction to minimize the harm to the defendants. Bezark had testified that the defendants planned to manufacture "about one hundred fifty units that year." Deliveries of these units were scheduled into April 1982, and Bezark further testified that the defendants were "absolutely" obligated to fulfill the purchase orders they had for these one hundred fifty units. This, of course, presented the picture of many lawsuits if the defendants did not perform. It was for this reason, among others, that the district court carved a limited exception to the injunction which permitted the defendants to complete the manufacture and delivery of the one hundred fifty units. The concern of the defendants for honoring contracts in this respect is in startling contrast to the utter disregard that they had for their obligations under the multimillion dollar contract with the plaintiff.

The district court's injunction bears directly upon other activity by the defendants which would cause Machlett further irreparable injury. Specifically, the court barred defendants from *further* eroding plaintiff's goodwill, from continuing to interfere in Amrad's relationship with its dealers and other customers, from introducing more x-ray equipment into the marketplace, and from soliciting other employees of Amrad.

Of course, it would be absurd to say that this particular plaintiff, a subsidiary of the Raytheon Company, would be insufficiently funded to continue to prosecute its lawsuit to trial, and it is not unreasonable to assume that the company would survive even with the competition which had been so secretly launched against it in violation of the specific covenants. The important and significant fact is, however, that the plaintiff has been and will be further irreparably harmed by competition which it bargained as a part of a multimillion dollar transaction not to have. In respect to this economic consequence of ability to continue the litigation, the majority opinion refers to *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1098 (7th Cir. 1976). However, it is important to recall that in that case the district court, in the exercise of its discretion, had denied the preliminary injunction. Here the district court in its discretion granted the preliminary injunction. In *Fox Valley Harvestore* the court quoted from an opinion of Justice (then Judge) Stevens in this court in *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 293 (7th Cir. 1974), as follows:

> Thus, the requirement of a "reasonable likelihood of success" is necessarily a somewhat flexible standard that allows the chancellor room for the exercise of judgment.

In the present case, it appears to me the majority opinion scarcely accords the respect to which the exercise of discretionary judgment is entitled under the above authority.

The majority opinion refers to the fact that when Techny completes the delivery of the one hundred fifty units in 1982 it would be out of business thereafter if the preliminary injunction continued in effect. This, of course, was exactly what the three owners of Techny contracted for in consideration of the receipt of 7.7 million dollars. I find it difficult to conceive how the defendants could have a real cause for complaint

under the circumstances of this case where they secretly, and without any notification or consultation with the plaintiff, launched a business from scratch and now come crying to the court that they will have to quit this business. This is not a case of a well established, long continuing business but one that the district court regarded as having been clandestinely begun in violation of the clear obligation of contract. In any event, in what I regard as the unlikely event of their ultimately prevailing, they are only required to cease operations for a relatively limited period of time. They have demonstrated already considerable ability in starting a business from point zero, doing so in such a fashion that the plaintiff also in the business was unaware of the commencement. I see no reason that they could not do so again, in the event of their prevailing in this litigation. The district court on a balance of the hardships came down in favor of Machlett, and on the facts in evidence before the district court, properly did so.

Even if it could be assumed *arguendo* that the direct competition between mobile and stationary x-ray equipment was on the limited side, the covenant here included indirect competition which was fully demonstrated in the record before the district court.

Techny did offer testimony that the defendants would lose approximately $500,000 if Techny were permanently enjoined from selling mobile x-ray units. The only injuries, however, which the district court had before it for balancing were those caused by the grant or denial of the temporary injunction. 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948 at 442 (1973).

Finally, on this point the defendant's potential harm is fully protected by the injunction bond ordered by the court and executed by the plaintiff. The court required the plaintiff to post a $500,000 bond which was the defendants' quantification of their loss from a *permanent* injunction.

Finally, the majority opinion holds that the preliminary injunction will disserve the public interest in health care and in low cost health care. This is purely, with all respect, a de novo analysis inconsistent with the record. Of course, Vatz, Bezark, and Craig were experts in the x-ray diagnostic industry. This expertise demonstrated by Amrad made it a desirable purchase for Machlett. The district court orally found that the public would in no way suffer as a result of any injunction prohibiting the competition by the defendant. This finding was based on undisputed evidence that mobile radiographic units are highly competitive in terms of cost and quality, and that as many as twenty manufacturers, including Toshiba, CGR, Picker, Standard, Phillips, Xonics and General Electric, manufacture and sell mobile x-ray units. The defendants were unable seriously to contend, and this court should not assert otherwise, in the face of these findings that the granting of an injunction would tend to create a monopoly or otherwise would disserve the public interest. The injunction granted merely permitted the plaintiff to take full advantage of the assets and opportunity it thought, with good reason, it had purchased for a substantial amount of money from the defendants.

In sum, the preliminary injunction granted by the district court merely preserved the status quo, for a period of time during the completion of the litigation, of the agreement the parties made that there would be no direct or indirect competition with the business for which the plaintiff had paid more than seven and one-half million dollars. This court should affirm that exercise of discretion.