**GREAT LAKES HIGHER EDUCATION CORPORATION, a nonprofit Chapter 181 Wisconsin corporation, Plaintiff,**

v.

**Lauro F. CAVAZOS, Secretary of the United States Department of Education; and United States Department of Education, Defendants.**

No. 88–C–159–C.

United States District Court,
W.D. Wisconsin.

Nov. 1, 1988.

David J. Hanson, Michael, Best & Friedrich, Madison, Wis., for plaintiff.

Neil H. Koslowe, Sp. Litigation Counsel, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

CRABB, Chief Judge.

This civil action for declaratory judgment is before the court on plaintiff's motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiff seeks to enjoin defendants from implementing the 1987 amendments to the Higher Education Act of 1965 by withholding reinsurance payments due plaintiff until $13,490,858 in excess reserves has been recovered pursuant to the Higher Education Act of 1965 as amended in 1987. 20 U.S.C. §§ 1072(e)(1), 1072(e)(2), 1078(c)(1), 1078(f)(1)(B), 1078(c)(9)(A). Plaintiff contends that the 1987 amendments constitute a taking of its property and contract rights in violation of its Fifth Amendment rights to just compensation and due process, that

the 1987 amendments violate its Fourteenth Amendment right to equal protection, and that the withholding of the reinsurance payments is unauthorized by law.

Because I find that plaintiff fails to show a need for a preliminary injunction, in that plaintiff fails to show either the absence of an adequate remedy at law or the presence of irreparable harm, plaintiff's motion for a preliminary injunction will be denied.

Based on the affidavits and supporting documents submitted by the parties, I make the following findings of fact solely for the purpose of deciding this motion for preliminary injunction.

### Facts

The Guaranteed Student Loan Program is a student financial assistance program established under the provisions of the Higher Education Act of 1965, as amended. As a guaranty agency in the GSL program, plaintiff has executed a series of agreements with defendants: Agreement for Federal Advances, Agreement for Federal Reinsurance of Loans, Supplemental Guaranty Agreement, and Interest Subsidy Contract (or basic agreement).[1] The contents of the agreements are governed by the Higher Education Act and are subject to subsequent changes in the act or the regulations that apply to the GSL program.

Plaintiff obtained federal advances pursuant to the federal advances agreement, in order to establish an initial reserve against claims. The advances can be used only for making claim payments to lenders to meet plaintiff's contractual guaranty obligations to those lenders.

Plaintiff has agreed to repay and has repaid a portion of its federal advances in 1988 as requested by defendants. Plaintiff will repay the remainder upon proper documented request. Plaintiff has always understood that federal advances were repayable under the federal advances agreement, unlike federal administrative cost al-lowances and federal reinsurance payments.

Plaintiff purchases reinsurance from defendants under the reinsurance and supplemental guarantee agreements. Plaintiff has paid and is paying for this reinsurance at the statutory rate that applied to all guaranty agencies prior to December 22, 1987. Currently plaintiff pays a reinsurance fee of a quarter of one percent based on a claims rate of less than five percent. If the claims rate exceeds five percent, the fee increases to one-half of one percent.

A claim is filed by a lender for payment by the guaranty agency when a borrower fails to repay a loan. The claims rate is the amount of reinsurance requested to cover these payments as a percentage of guaranteed loans in repayment at the end of the preceding fiscal year.

Plaintiff receives reimbursement under the reinsurance agreement for eighty percent of the amount it expends to discharge its guaranty obligations to lenders, provided plaintiff meets its due diligence obligations.

Pursuant to the supplemental guarantee contract, plaintiff is entitled to reinsurance payments of up to an additional twenty percent (raising total reinsurance to one hundred percent) of the expenditures made in discharge of its guaranty obligations to lenders, depending on its claims rate. Plaintiff is reimbursed for one hundred percent of claims filed until the claims rate equals five percent, for ninety percent of claims filed while the claims rate exceeds five percent but does not exceed nine percent, and for eighty percent of claims filed while the claims rate is over nine percent. Plaintiff receives no reinsurance reimbursement for claims concerning which either pre-default actions by lenders or post-default collection actions by plaintiff do not meet statutory and regulatory due diligence requirements.

The reinsurance payments reimburse plaintiff after plaintiff has used its own

**1.** According to 34 C.F.R. 682.400 there is a fifth agreement, a secondary administrative cost allowance agreement. From plaintiff's references in its affidavits and brief to the receipt of ad-ministrative cost allowances from defendants, it can be inferred that plaintiff executed this agreement as well.

funds, plus federal advances, to pay claims. Plaintiff advanced its own funds based on the understanding that the reinsurance contracts were in force and that reimbursement would be made.

Pursuant to the interest subsidy contract, lenders and subsequent holders of loans guaranteed by plaintiff are entitled to receive that portion of interest which students are entitled to have paid on their behalf.

None of the agreements entered into by plaintiff and defendants refers to or requires repayment of federal administrative cost allowances, or requires that administrative cost allowance dollars or reinsurance payments be segregated from other guaranty funds. Federal reinsurance payments are required to be repaid only in the event a loan was improperly originated or serviced.

At no time prior to December 22, 1987, had defendants notified plaintiff that administrative allowances were provided conditionally or subject to repayment, or that reinsurance payments were provided conditionally or subject to repayment unless a loan was improperly originated or serviced.

Plaintiff has entered into loan guaranty contracts with private lenders, the State of Wisconsin, and the Student Loan Marketing Association currently involving approximately $2.3 billion of loans for which plaintiff has principal guaranty responsibility. Plaintiff has loan guaranty contracts with over 670 lenders.

Plaintiff's contracts with lenders have been entered into based upon reliance by the parties on the validity and enforceability of plaintiff's contracts with defendants which ensured the continued availability of federal reinsurance until the contracts were properly terminated or amended by consent.

Plaintiff's guaranty to lenders is unconditional. If lenders properly originate and service student loans, plaintiff is contractually obligated to guarantee those loans, regardless whether plaintiff receives reinsurance reimbursement from defendants.

Federal reinsurance is conditioned on plaintiff's and the lender's due diligence in originating and servicing the loan, and on plaintiff's claims rate. Not every loan guaranteed and purchased by plaintiff is reinsured by defendants. Lenders have assumed that the guaranty fund generated by their fees would be available as security for plaintiff's guaranties.

The guaranty fund functions as a reserve to ensure plaintiff's ability to meet its contractual guaranty obligations. The principal sources of the guaranty fund are insurance fees charged to lenders and generally paid by student borrowers, federal administrative cost allowances, federal reinsurance payments, and interest and investment earnings.

The total amount of the guaranty fund in cash and invested assets at August 31, 1988, was $30,331,242. For fiscal year 1989, beginning October 1, 1988, plaintiff's guaranty program budget is $12,565,700 for operations plus $2,300,000 to be added to the guaranty fund to strengthen reserves. Plaintiff's projected administrative costs for fiscal year 1989, including the reinsurance premium payable to defendants, is $13,700,000.[2]

The administrative cost allowance received by plaintiff can be no greater than one percent of the total new loans guaranteed by plaintiff in any given fiscal year.[3] Because plaintiff's actual administrative costs have recently been greater than that

---

2. The two sets of fiscal year 1989 figures are taken from two separate affidavits submitted by Richard H. Johnston, a Great Lakes vice president. It is not clear whether or in what way the program budget differs from the administrative costs projection.

3. While administrative cost allowances are figured only on new loans, plaintiff incurs administrative expenses for all loans which it guaran-

tees. For example, in fiscal year 1987, plaintiff guaranteed new loans in the amount of $316,-450,000, but was responsible for $1.7 billion in total outstanding loans, with $1.2 billion actually in repayment. In fiscal year 1988, plaintiff guaranteed new loans in the amount of $575,-800,000, and total value of outstanding loans guaranteed by plaintiff increased to $2.3 billion, with $1.6 billion in repayment.

amount, the administrative cost allowance received by plaintiff contributes only a portion of plaintiff's administrative costs.

Plaintiff's administrative costs from 1967 to December 22, 1987 totalled approximately $41,606,058. Plaintiff received administrative cost allowances during the same period totalling $33,856,580. In fiscal year 1988, plaintiff incurred administrative costs, including the reinsurance premium payable to defendants, of $10,627,500, and received administrative cost allowances of $2,630,000. For fiscal year 1989, plaintiff projects administrative costs at $13,700,000, and administrative cost allowances of $4,350,000.

Plaintiff paid a total of $192,605,044 in default claims to lenders pursuant to its guaranty contracts prior to December 22, 1987. For those claims plaintiff received reinsurance payments from defendants prior to December 22, 1987 of $184,105,843. Thus, approximately $8.5 million in default claims were paid by plaintiff but unreimbursed by reinsurance payments from defendants between 1967 and 1987.

Plaintiff received $29,722,199 in insurance fees, charged to lenders and generally paid by student borrowers, prior to December 22, 1987. This amount exceeds the total dollar amount of cash or cash equivalents now in the guaranty fund excluding federal advances. This amount does not include investment earnings on insurance fees, which are approximately $14.3 million since 1967.

All of the money in the guaranty fund, except the federal advances, became the property of plaintiff on or before receipt and belongs to plaintiff.

The Omnibus Budget Reconciliation Act was enacted on December 22, 1987. Section 3001 of that Act amended § 422 of the Higher Education Act. Section 422 requires defendants to determine the maximum amount of cash each guaranty agency can accumulate in its reserve fund, and to direct each guaranty agency with more than that amount to reduce its excess cash reserves by one or more of the following methods as selected by the guaranty agency:

(a) by obtaining repayment by the guaranty agency of federal advances not already required to be repaid;

(b) by withholding and cancelling claims for reimbursement otherwise payable;

(c) by reducing the amount of payments for which application will be made by a guaranty agency for administrative allowances; or

(d) by any other method of reducing payments from or increasing payments to the federal government, including payment of additional reinsurance fees.

On February 9, 1988, defendants sent a letter to each guaranty agency with excess cash reserves and directed it to reduce its excess cash reserves by a specified amount. Thirty-six agencies requested waivers of the proposed reductions, and final waiver determinations are being made and sent to those agencies.

As of September 28, 1988, four guaranty agencies had paid their excess cash reserves to defendants without applying for a waiver. Amounts received by defendants from those agencies have been deposited in the student loan insurance fund established under § 431 of the Higher Education Act. As additional excess cash reserves payments are received, those funds will also be deposited into that insurance fund. The fund is used to make payments for defaulted loans and for payments made under guaranty agreement under § 428 of the Higher Education Act. Federal law requires that the Guaranteed Student Loan Program receive the funds necessary to meet the costs incurred by the student loan insurance fund.

Section 422(e) of the Higher Education Act requires defendants to direct the reduction of up to $250 million in cash reserves. Congress considered the $250 million to represent a savings to the Guaranteed Student Loan Program and took that amount into account in determining the Guaranteed Student Loan Program's budget for fiscal year 1988. The Guaranteed Student Loan Program's total appropriated budget for fiscal year 1988 exceeds $2.5 billion.

Defendants notified plaintiff in a letter dated February 9, 1988, that plaintiff has $13,490,858 in excess cash reserves that must be recovered by defendants. Plaintiff was asked to inform defendants by February 29, 1988, later extended to March 15, 1988, which of the statutorily provided recovery methods it would use to eliminate its excess cash reserves. In the letter defendants noted that if a recovery method was not selected by the deadline, defendants would choose a recovery method for plaintiff. Plaintiff declined to choose a recovery method because it considers the excess cash reserve recovery requirement unconstitutional.

In a letter dated September 9, 1988, defendants informed plaintiff that because plaintiff had failed to select a recovery method, defendants had selected a method for plaintiff under § 422(e)(2)(B) of the Higher Education Act. In the letter defendants explained that they will apply the amount of plaintiff's pending and future eligible reinsurance claims filed with defendants to the $13,490,858 owed by plaintiff until that amount is completely paid.

At the time plaintiff received the September 9, 1988 letter, plaintiff had already submitted insurance claims for the month of August in the amount of approximately $3,839,755. Those claims were processed by defendants who notified plaintiff on September 22, 1988 that those claims are eligible for payment. Ordinarily, the claims would have been paid on or about October 10, 1988. None of the claims for the month of August are for loans made after passage of legislation amending the Higher Education Act in December 1987.

All Guaranteed Student Loan Program borrowers are granted a six-month grace period, with no payments due, after the borrower leaves school. A loan cannot be submitted for claim for at least ninety days after the borrower defaults or 450 days after the borrower leaves school. None of the loans included in the $3.8 million August reinsurance claims could have been made after December 22, 1987, when the excess cash reserves recovery provisions were enacted. The oldest loan included in the August reinsurance claims was made on September 5, 1973. Few, if any, of the claims that will be paid during the proposed period of draw-down, October 1988 to March 1989, will have been made after the effective date of the amendments.

All of the loans guaranteed by plaintiff were made by lenders and guaranteed by plaintiff under the assumption that plaintiff was eligible for no less than eighty percent reinsurance. Withholding $13.49 million in reinsurance claims is contrary to this assumption.

Plaintiff called defendants and asked what they planned to do about the pending August reinsurance claims. Plaintiff was informed that defendants will apply the amount due on those eligible reinsurance claims to the $13,490,858 which defendants claim is owed by plaintiff as excess reserves.

If defendants do not pay the pending $3,839,755 in claims, plaintiff will lose interest earnings on that amount at the rate of $517 per day from about October 10, 1988, when the money would have customarily been received, based on eight percent simple interest. Because of certain offsets due defendants, the net amount due plaintiff for reinsurance payments would be $2,436,714. Interest is calculated on this net amount.[4]

The amount of August reinsurance claims is representative of plaintiff's average monthly submission of reinsurance claims to defendants. Lost interest from November 10 on unpaid August and September claims would accrue at approximately $1,034 per day; from December 10 on unpaid August, September and October claims, at approximately $1,551 per day; from January 10, 1989 on unpaid August, September, October and November claims, at $2,068 per day; from February 10 on

4. In a letter dated September 22, 1988, defendants notified plaintiff that plaintiff must make additional payments to cover the amounts due defendants that would normally be offset against plaintiff's reinsurance claims and so would normally require no such additional payments.

unpaid August through December claims, at $2,585 per day; from March 10 on unpaid August through January 1989 claims, at $3,102 per day.

At a monthly claims rate in the amount of the reinsurance claims made for August, defendants will recover the $13,490,858 in excess reserves by taking the August through January 1989 claims payments. Ordinarily, the last of those payments would be made on March 10, 1989. Between October 10, 1988, when the pending August claims should be paid, and March 10, 1989, when the January 1989 claims should be paid, plaintiff will lose approximately $100,835 in interest. Plaintiff will continue to lose $90,611 in interest on the lost claims payments each month thereafter.

If plaintiff's guaranty or reserve fund is reduced by $13.49 million by March 1989, plaintiff's interest earnings on that fund will be reduced as well. The $13,490,858 sought by defendants is forty-four percent of plaintiff's total guaranty fund as of August 31, 1988. An ongoing forty-four percent annual reduction of the interest income equals $880,000.[5]

Defendants promulgated comprehensive lender due diligence rules which took effect on March 11, 1987. The due diligence rules specify in great detail the collection actions lenders must take whenever a loan become delinquent. In addition to these specific due diligence activities, lenders are required to meet timely filing requirements. Lenders must carefully document compliance in borrowers' records.

Before plaintiff pays a lender's guaranty claim and buys a loan, the lender must submit evidence that it has met the due diligence standards. Plaintiff must verify that the lender has met the standards and must keep a historical record of these actions on its own computer.

If plaintiff discovers in its claims review process that a lender has failed to meet one of the requirements, it assesses a penalty against the lender. The penalty may be a denial of interest benefits and special allowances if the infraction is minor, or complete denial of the claim (loss of principal) if the infractions are severe.

Lenders and guarantors must be more concerned about taking the specific required actions within the specified time frames than in actually collecting the loans. This defensive action is necessary to avoid technical violations that could lead to loss of interest or of the loan guaranty entirely.

From the commencement of the Guaranteed Student Loan Program in 1967 until the due diligence requirements were imposed in March 1987, plaintiff rejected 219 guaranty claims totalling approximately $653,607 from its lenders. After the due diligence requirements became effective, from March 1, 1987, until August 31, 1988, plaintiff rejected 382 claims totalling approximately $1,067,000.

Revised due diligence requirements were issued in March 1988 but did not alleviate the burdens of compliance on lenders and guaranty agencies. The new due diligence rules will significantly increase the administrative costs of compliance by both lenders and plaintiff.

---

**5.** Plaintiff alleges that this $880,000 reduction in annual interest income "amounts to" a 6.4 percent reduction in its operations budget, a "deficit" which plaintiff claims would most obviously be covered by increasing from the current one percent to 1.25 percent the insurance fee charged to lenders and passed through by them to student borrowers.

Plaintiff avers that such a twenty-five percent fee increase disadvantages students and makes plaintiff less competitive in the national market. Guaranty agencies may charge an insurance premium of up to three percent of the principal amount of the loan. As of June 1988, thirty-three guaranty agencies charge more than one

percent, nine charge one percent, two charge one-half percent, four impose no charge, and seven charge from zero to three percent depending on the educational institution attended by the borrower.

Because plaintiff does not explain why or how the reduction in interest income automatically translates into an operations budget deficit, or why the alleged operations budget shortfall cannot be covered with money from the guaranty fund principal rather than from insurance fee payments, I make no factual findings concerning the alleged interest income reduction, operations budget deficit, or insurance fee increase connection.

As a result of increased due diligence requirements, some lenders whose Guaranteed Student Loan Program loans are guaranteed by plaintiff are selling their Guaranteed Student Loan portfolios, seeking outside servicing, and getting out of the Guaranteed Student Loan Program. Any other action that might further jeopardize the lenders' security, such as the $13,490,858 reduction in plaintiff's guaranty fund, could cause more lenders to withdraw from active participation in the program.

It is generally known by lenders that federal reinsurance is provided only upon compliance with the due diligence rules. The availability of federal reinsurance is vital to maintaining lender confidence in the Guaranteed Student Loan Program. In addition to being concerned about the new due diligence requirements, lenders are also concerned about plaintiff's ability to maintain one hundred percent reinsurance.

Plaintiff will not be fully reinsured if its claims rate exceeds five percent, and it is not reinsured at all where the lender or plaintiff failed to meet due diligence requirements. For those claims which are not fully reinsured and which lenders have not lost due to improper due diligence, plaintiff must pay its guaranty obligations to lenders from its reserve fund.

Lenders are concerned about plaintiff's ability to meet its guaranty obligations from its reserve fund. If plaintiff loses over forty percent of its liquid assets, lenders may be concerned about plaintiff's financial capacity. The options before such lenders include placing fewer loans with plaintiff, finding another guarantor with a better reserve-to-loans-in-force ratio, and leaving the Guaranteed Student Loan Program.

Lenders are concerned about plaintiff's ability to meet its guaranty obligations in light of the expansion of its business and the increase in loans it guarantees. Plaintiff competes regionally and nationally. It currently has guaranty contracts with lenders in a number of states, including Wisconsin, Michigan, Ohio, Illinois and Minnesota. Plaintiff has several national clients, including Marriott Credit Union, Financial Reserve Corporation, and the Student Loan Marketing Association. In fiscal year 1988 plaintiff guaranteed $313 million in student loans for the Student Loan Marketing Association in Washington, D.C., with whom plaintiff has its largest guaranty contract. Over fifty-seven percent of plaintiff's new business last year was from lenders based outside Wisconsin. That percentage has grown steadily over the last three years.

In the last few years, a number of national and regional lenders have become involved in the Guaranteed Student Loan Program seeking to deal with one guaranty entity which can handle their business on a national or regional level. To these national and regional lenders, the strength of a guaranty agency, as measured by its reserves, is important both because of the claims rate vulnerability and the conditional nature of reinsurance. Also important is the guaranty agency's ability to provide certain services in conjunction with the guaranty, including loan origination servicing and a twenty-four-hour turnaround on requests for guarantees of individual Guaranteed Student Loan Program loans.

The Higher Education Act as amended gives defendants until September 30, 1989 to collect the excess reserves. Plaintiff's guaranty fund, which currently contains over $30 million, is expected to contain funds sufficient to pay the excess reserves requested by defendants until that date.

### Opinion

Plaintiff must establish five elements in order to succeed on a motion for preliminary injunction: 1) that plaintiff has no adequate remedy at law; 2) that plaintiff will suffer irreparable harm if the injunction is not issued; 3) that the harm to plaintiff if the injunction is not granted is greater than the harm to defendants if the injunction is granted; 4) that the injunction will not harm the public interest; and 5) that plaintiff has a reasonable likelihood of prevailing on the merits. *Brunswick Corporation v. Jones*, 784 F.2d 271, 273–74 (7th Cir.1986).

### 1. No Adequate Remedy at Law

It is well established that injunctive relief is not available for purely monetary injuries because monetary injuries are fully compensable by an award of damages after trial. *Tele–Controls, Inc. v. Ford Industries*, 388 F.2d 48, 50 (7th Cir.1967), *cited in Jordi v. Sauk Prairie School Board*, 651 F.Supp. 1566, 1581 (W.D.Wis.1987); *Nuclear–Chicago Corporation v. Nuclear Data, Inc.*, 465 F.2d 428, 430 (7th Cir.1972) (traditional rule is that availability of money damages precludes preliminary injunction). In the instant case both parties suggest that plaintiff may sue for the funds withheld by defendants in the claims court under the Tucker Act. 28 U.S.C. 1491(a). 28 U.S.C. 1491(a) grants the claims court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States...."

■ Allegations of due process, uncompensated taking, or equal protection clause violations do not alone confer jurisdiction on the claims court under the Tucker Act. Plaintiff must point to a provision of the federal constitution, statutes, administrative regulations, or contract that mandates payment of money damages by the government to plaintiff. *See United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *Price v. United States*, 621 F.2d 418, 420, 224 Ct.Cl. 58 (1980) (plaintiff must show that particular provision of law relied on that grants plaintiff right to a certain sum); *Heart of the Valley Metropolitan Sewerage District v. United States Environmental Protection Agency*, 532 F.Supp. 314, 317 (E.D.Wis. 1981) (to prevail on claim for money not paid but allegedly due, plaintiff must show that particular provision relied on grants plaintiff right to certain sum); *Heagy v. United States*, 12 Cl.Ct. 694 (1987); *Nanfelt v. United States*, 1 Cl.Ct. 223 (1982).

■ In the instant case plaintiff points to provisions both in the Higher Education Act and in its agreements with defendants that mandate payment of the reinsurance claims and that give plaintiff explicit contractual rights against the government of recovery for those claims. Therefore, plaintiff can sue defendants under the Tucker Act to recover the money, regardless of the theory under which it proves the money to have been wrongfully withheld. *See Rogers v. Ink*, 766 F.2d 430, 434–35 (10th Cir.1985) (claims court has exclusive Tucker Act jurisdiction over community action association's monetary claim refused by government); *Portsmouth Redevelopment and Housing Authority v. Pierce*, 706 F.2d 471, 473 (4th Cir.1983), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed. 2d 336 (plaintiff's suit to enjoin HUD from withholding operating subsidies due under annual contributions contract was properly before claims court under Tucker Act because suit essentially involved contract clause against the government); *Heart of the Valley*, 532 F.Supp. at 318 (claims court had jurisdiction over claim based on contention that statute and regulation entitle plaintiff to reimbursement for funds expended).

In *Portsmouth Redevelopment and Housing Authority*, 706 F.2d 471, plaintiff contended that the government could not modify its contractual obligation to pay operating subsidies by unilaterally altering terms of the annual contributions contract to incorporate new provisions in the statute. 706 F.2d at 474. The claim was held to be properly before the claims court under the Tucker Act either as a claim founded on contract, or as a claim to interpret the Constitution, statutes or regulations pertinent to the contract. *Id.* at 475. Because the claims presently before this court are also founded on a contract with the government and on statutory provisions pertinent to that contract, and because the statutory provisions mandate the payment of reinsurance claims to plaintiff, I conclude that plaintiff does have an adequate remedy at law under the Tucker Act to recover those reinsurance claims.

■ Plaintiff concedes that this remedy is available but contends that the remedy is not adequate because plaintiff is barred by the no-interest rule from recovering the

$100,835 in interest that will accrue between October 1988 and March 1989, during which time $13,490,858 in reinsurance claims will be withheld. Under the no-interest rule, there can be no recovery against the United States for interest in the absence of an express waiver of sovereign immunity from the award of interest. *Library of Congress v. Shaw*, 478 U.S. 310, 315–17, 106 S.Ct. 2957, 2962–63, 92 L.Ed. 2d 250 (1986). Should plaintiff succeed in this action, it would not be entitled to any prejudgment interest, which would amount to $100,835 in March 1989 and would increase by about $90,000 per month each month thereafter.

▮ That plaintiff cannot recover that to which it is not entitled does not make an available remedy inadequate. *See Black United Fund of New Jersey, Inc. v. Kean*, 763 F.2d 156, 161 (3rd Cir.1985) (that Eleventh Amendment may pose obstacle to recovery of damages in federal court does not transform monetary loss into irreparable injury for equitable purposes). Moreover, in order to be inadequate, a remedy must be seriously deficient. *Roland Machinery Company v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir.1984). A loss of $100,835 represents less than one percent of the total amount of money plaintiff is seeking to recover.

The harm suffered by plaintiff is the loss of $13,490,858, plus whatever additional monetary loss plaintiff can prove has been caused it by the exit of lenders and Guaranteed Student Loan Program accounts as a result of the $13,490,858 reduction in plaintiff's reserves. A remedy that restores the full $13,490,858 sought by plaintiff, but not an additional $100,835 in interest forgone while plaintiff was earning interest on reserves of over $30,000,000, is not seriously deficient.[6]

In sum, plaintiff's failure to show that it has no remedy under the Tucker Act weighs heavily against the granting of equitable relief. *Union Carbide Agricultural Products Co, Inc. v. Costle*, 632 F.2d 1014, 1019 (2nd Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196, *reh'g denied*, 451 U.S. 976, 101 S.Ct. 2059, 68 L.Ed.2d 358 (injunctive relief is not available if plaintiff can recover under Tucker Act).

### 2. Irreparable Harm

Plaintiff alleges irreparable harm on two grounds. First, plaintiff contends that the alleged violation of its constitutional rights constitutes irreparable injury as a matter of law. Second, plaintiff contends that it will be irreparably injured as a matter of fact because the reduction of its reserves in conjunction with the more burdensome due diligence requirements will harm its competitive position and may force it to increase the fee charged lenders and paid by students.

▮ The rule against injunctive relief for monetary damages may be inapplicable where plaintiff alleges violation of its constitutional rights. *Jordi*, 561 F.Supp. at 1581. Most courts hold that no further showing of irreparable injury is necessary in cases involving alleged violations of First Amendment rights. *See id.;* 7–Pt. 2 Moore's Federal Practice ¶ 65.04[1], n. 66 (all cases cited involve First Amendment rights claims); Wright & Miller, Federal Practice and Procedure: Civil § 2948 at 440 (most cases cited involved First Amendment rights claims).

In cases involving claims of interference with constitutional rights other than First Amendment rights, further showing of irreparable injury may not be required if more than just money is at stake. *See* Wright & Miller, Civil § 2948 at 440; *Jen-*

---

6. Both parties note that plaintiff could recover the interest if it succeeded in showing an uncompensated taking in violation of the Fifth Amendment. *Library of Congress v. Shaw*, 478 U.S. at 317 n. 5, 106 S.Ct. at 2963 n. 5. However, plaintiff cites no compensation clause cases to support its claim of an uncompensated taking. Moreover, if the taking of plaintiff's reserves must be compensated then the taking itself is nullified. The question then becomes whether the taking is proper in the first place, which is a question of a taking without due process. Because plaintiff is not likely to be able to show an uncompensated taking, this exception to the no-interest rule is not relevant.

sen v. *Village of Lyndon Station,* 519 F.Supp. 1183, 1189 (W.D.Wis.1981) (termination of employment). In the instant case, even if all the harms envisaged by plaintiff are provable, the injuries claimed are all matters of monetary damages amenable to estimation: loss of reserves due to defendants' withholding of reinsurance claims, and loss of accounts due to the reduction in reserves. The loss of a discrete amount of funds does not constitute irreparable injury where plaintiff can recover those funds in an ascertainable amount. *United States v. Commonwealth of Pennsylvania,* 533 F.2d 107, 111 (3rd Cir.1976) (denial of preliminary injunction to enjoin United States from withholding federal funds due Pennsylvania).

I decline to establish a rule that the allegation that money has been taken in violation of the due process and equal protection clauses constitutes irreparable injury as a matter of law. Plaintiff does not show that it cannot be compensated with money damages if defendants' withholding is not enjoined but found to be unconstitutional. *Machlett Industries, Inc. v. Techny Industries, Inc.,* 665 F.2d 795, 797 (7th Cir.1981). That all the injuries alleged may be compensated by money damages weighs heavily against plaintiff's claim or irreparable harm. *Shaffer v. Globe Protection, Inc.,* 721 F.2d 1121, 1124–25 (7th Cir.1983 (sex discrimination action).

Moreover, the claim itself of injury is questionable. Plaintiff argues that the due diligence requirements will increase the number of unreimbursed claims, that lenders are therefore concerned that plaintiff have adequate reserves, and that the reductions in plaintiff's reserves will drive lenders to other agencies or out of the Guaranteed Student Loan Program altogether.[7] The numbers provided by plaintiff belie such a pessimistic prediction, and show it to be speculative at best.

Plaintiff projects its current operating budget including reinsurance premiums at $13,700,000. That budget will be reduced

by a projected administrative cost allowance of $4,350,000, leaving $9,350,000 to be covered by plaintiff from its reserves. That amount will be further reduced by projected income from the one percent student fee of $4,350,000, leaving $5,000,000 to be covered by plaintiff from its reserves.

As of August 1988 plaintiff's reserves total $30,331,242. If defendants withhold $13,490,000 from plaintiff, $16,841,242 of reserves will remain (excluding interest earned on plaintiff's reserves while they are being drawn down). If plaintiff uses $5,000,000 of its remaining reserves to cover its operating budget, $11,841,242 will remain to cover unreimbursed claims and other expenditures. That amount does not seem inadequate in light of the fact that plaintiff spent approximately $8 million to cover unreimbursed claims over the last twenty years, and plaintiff does not allege that the amount remaining will be insufficient to cover its guaranty obligations.

Plaintiff also does not allege that the reserves-to-loans ratio represented by $11,841,242 in reserves is worse than the ratio for other guaranty agencies, or that plaintiff's current ratio with over $30 million in reserves is ideal or necessary to maintain its competitive position. In supporting affidavits plaintiff shows that lenders are concerned first about plaintiff's expansion, and then incidentally about plaintiff's reserves-to-loans ratio. That the reduction in reserves may slow such expansion or alter plaintiff's operating plans does not constitute irreparable harm.

Plaintiff also shows that lenders may look for agencies with better ratios, but there is no allegation that other agencies do have better ratios. Defendants show that four guaranty agencies have turned over their excess reserves to defendants and that thirty-six other agencies have sought a waiver, which means that either their economic status is not as good as the amount of their reserves reflects or that they are bound by other contractual provisions. Consequently, other guaranty agen-

---

**7.** In its brief plaintiff focuses on the increase in disqualified loans, which neither defendants nor plaintiff are obligated to cover, and which is

therefore not relevant to the question of the effect of a reduction in plaintiff's reserves.

cies either have no excess reserves, are in an unfavorable economic position, or are contractually bound to a specific ratio. Plaintiff does not allege that, after defendants withhold the $13,490,858, its new ratio will be worse than the ratios of any of these other agencies.

■ In sum, plaintiff offers no proof that the unenjoined withholding of $13,490,858 will so deplete its resources or diminish its standing in the market that it will be unable to operate or compete. *Machlett Industries*, 665 F.2d at 797. Even if the reduction in reserves were to result in some loss of accounts to other agencies, such a loss is still compensable by money damages and therefore not irreparable. *See Nuclear–Chicago Corporation v. Nuclear Data, Inc.*, 465 F.2d 428, 430 (7th Cir.1972) (there is no irreparable injury that cannot be recouped by money damages where plaintiff alleges potential competition from third parties).

■ Finally, plaintiff avers that it may have to increase the fee it charges lenders in order to keep its reserves high enough to keep the lenders. Plaintiff contends that because that fee is normally paid by student borrowers, the students will suffer. However, the burden that would be imposed on students by an increase in the fee does not constitute the irreparable injury necessary to entitle plaintiff to a preliminary injunction; that prerequisite is not satisfied by harm to a third party. *American Dairy Queen Corporation v. Brown–Port Company*, 621 F.2d 255, 259 n. 4 (7th Cir.1980).

### 3. Balance of Harms and Public Interest

In this case the balance of harms and the public interest are related, because of the nature of the parties—one nonprofit and the other public—and because of the nature of the service at issue—subsidized loans for higher education. If either party is harmed, the public loses.

As it is now alleged, the harm to plaintiff if plaintiff ultimately wins but defendants are not enjoined from withholding $13,490,-858 and so depleting plaintiff's reserves, is speculative, short-term, and compensable, and does not adversely affect plaintiff's ability to operate and meet its guaranty obligations. Moreover, because plaintiff is nonprofit and cannot use its reserves except for Guaranteed Student Loan Program purposes, no personal loss is incurred. The harm to defendants if plaintiff ultimately loses but defendants are enjoined from withholding $13,490,858, is also temporary and does not impair defendants' ability to meet their statutory obligations. The public interest does not appear to be disserved either way.

■ The fact that the grant of a preliminary injunction will not hurt defendants does not justify granting the injunction if the denial will not hurt plaintiff, because plaintiff must show a *need* for the injunction. *Omega Satellite Products Company v. City of Indianapolis*, 694 F.2d 119, 124 (7th Cir.1982). In the instant case plaintiff shows no such need.

### 4. Likelihood of Success on the Merits

I need not consider whether plaintiff shows a reasonable likelihood of success on the merits because plaintiff fails to prove lack of adequate remedy and irreparable harm. *Machlett Industries*, 665 F.2d at 797; *Shaffer*, 721 F.2d at 1123 (no preliminary injunction where no showing of irreparable harm and lack of adequate remedy); *United States v. Commonwealth of Pennsylvania*, 533 F.2d at 110 (failure to demonstrate irreparable injury enough to defeat preliminary injunction to enjoin United States from withholding federal funds due Pennsylvania). Even if plaintiff is likely to win, plaintiff is not entitled to a preliminary injunction because any harm to plaintiff from the denial of the injunction can be repaired by an award of damages. *Omega Satellite Products*, 694 F.2d at 123; *Nuclear–Chicago Corporation*, 465 F.2d at 430, 430 n. 4 (even where plaintiff might win, no preliminary injunction where plaintiff cannot prove irreparable harm and where plaintiff cannot recoup losses with money

**1476**

damages). [8]

*Order*

IT IS ORDERED that plaintiff's motion for a preliminary injunction is DENIED.

---

**8.** Although in order to deny a motion for preliminary injunction the court is not required to assess the merits where the plaintiff fails to prove irreparable harm and no adequate remedy, there are circumstances in which such an assessment may be desirable. *Omega Satellite Products*, 694 F.2d at 124. For example, evaluating the merits on appeal may provide the district court with some guidance for the conduct of the trial. *Id.* The district court may itself decide to examine the merits where the granting of the injunction would have "emboldened" the plaintiff to take substantive action solely on the strength of the injunction. *Id.* (where plaintiff might have begun building a cable television system if the injunction had been issued). Finally, the merits should be examined if timeliness is critical, such as where the First Amendment rights of political speech are implicated. *Libertarian Party of Indiana v. Packard*, 741 F.2d at 985–86 (7th Cir.1984). None of these considerations is relevant here.