**CALUMET BREWERIES, INC., Plaintiff,**

v.

**G. HEILEMAN BREWING COMPANY, INC., Defendant.**

**No. 2:94 cv 165JM.**

United States District Court, N.D. Indiana, Hammond Division.

Dec. 14, 1994.

Daniel D. McDevitt, Michael P. Padden, John T. Cusack, Gardner Carton and Douglas, Chicago, IL, for Plaintiff.

David C. Jensen, Eichhorn Eichhorn and Link, Hammond, IN, James Klenk, Sonnenschein Nath and Rosenthal, Chicago, IL, for Defendant.

### MEMORANDUM DECISION AND ORDER

MOODY, District Judge.

Before the court after hearing[1] and extensive post-hearing briefing[2] is plaintiff Calumet Breweries, Inc.'s ("Calumet") motion for a preliminary injunction. Calumet is an Indiana corporation engaged in the business of wholesale beer distribution. G. Heileman Brewing Company, Inc. ("Heileman"), a Delaware corporation, is, to belabor the obvious, a brewer of malt beverages.

Calumet seeks to enjoin a Heileman marketing practice, referred to by the parties and the court herein as the "quantity discount program," under which the price an Indiana beer wholesale distributor pays for Heileman products depends on the total quantity of Heileman products the wholesaler purchases that month: within limits set by Heileman, the larger the purchase, the cheaper the price. Among other legal theories, which can be ignored for now, Calumet contends the quantity discount program violates § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a) (hereinafter, "Robinson–Patman § 2(a)").

The following facts, which for the most part have been stipulated to[3], provide the context necessary for the discussion that follows. Otherwise, the court's findings of fact and conclusions of law, as required by FED.

---

**1.** At the hearing Calumet objected to the admission of Heileman's exhibits 11, 18 and 21 on the basis that they lacked foundation and were hearsay. The court withheld ruling on their admission. Because the documents comprising those exhibits have not been properly authenticated, the objection is sustained.

**2.** Calumet's October 4, 1994, motion to supplement the record is **GRANTED.** In addition, the affidavit of Elizabeth Lange, attached to Heileman's response to Calumet's motion to supplement, is allowed as a supplement to the record.

**3.** Any "fact" mentioned which has not been stipulated to may be considered a preliminary finding of fact.

R.CIV.P. 52(a), are stated where relevant in the text.

Heileman has a brewery in LaCrosse, Wisconsin. Calumet, like other Indiana wholesalers who purchase beer from Heileman, does so by purchasing F.O.B. LaCrosse. At the LaCrosse brewery, Heileman loads the beer on a commercial carrier's truck. Indiana law requires beer wholesalers to pay cash for all beer purchases, so, before the loaded truck leaves, Calumet pays Heileman by wire transfer (or other method of immediate funds transfer). Then, at Calumet's expense, the beer is shipped to its warehouse in Hammond, Indiana.

Heileman has used the quantity discount program to sell beer to Indiana wholesalers since 1987. Under the program, a discount is applied to the purchase price of a selected product(s), the amount of the discount depending on the total amount of the product(s) purchased that month, calculated by the case (or case-equivalent). For example, in April 1994, the discount was available for 24–can cases of beer in the "Old Style Family," i.e., Old Style, Old Style Light, Old Style Draft, etc.[4] Wholesalers purchasing 4,500 cases to 19,999 cases received a discount of $.10 per case; 20,000 to 34,999 cases, $.20 per case; 35,000 to 54,999 cases, $.30 per case; 55,000 to 149,999 cases, $.40 per case; and 150,000 cases and over, $.50 a case.

The discount, calculated at the month's end, is applied as a credit to future purchases. The product(s) for which the discount is offered, the amount of the discount and the purchase quantity necessary to obtain a particular discount have varied from month-to-month. In some months no quantity discount is offered, there is "no program" that month.

Indiana does not restrict beer distributors to a particular geographic market: any Indiana distributor can sell to any Indiana retailer. The principal market for Heileman

products in Indiana is the northwest region of the state—the contiguous counties of Lake, Porter and LaPorte. Lake County is the strongest market: Heileman products outsell any other brand there. The largest wholesale distributor of Heileman products in Indiana is Central Distributing Company ("Central"). Central and Calumet are both located in Lake County. The competitive picture for the two wholesalers presented by these circumstances need not be brushed in further.

Central typically purchases enough beer[5] from Heileman each month to qualify for the maximum discount, usually $.50. Calumet hardly ever does. It has not purchased enough beer to get the maximum discount since January 1, 1988. Calumet's monthly purchases usually qualify for the minimum available discount ($.10), but occasionally for a $.20 discount or no discount. As a result, Calumet's effective cost is quite often $.40 a case higher than Central's. Absent significant cost savings elsewhere, this difference in wholesale cost makes it difficult, if not on occasion impossible, for Calumet to compete with Central's price while enjoying the same profit margin.

**ANALYSIS**

The verbal summation of a movant's burden to obtain a preliminary injunction varies from case-to-case. It has recently been summarized as follows:

> A preliminary injunction is warranted if a movant can make a threshold showing (1) that the case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; (3) that the movant will suffer irreparable harm if the injunction is not granted. If these three conditions are met, then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently.

4. The court takes notice of the current proliferation of beer styles available—genuine light draft, ice-brewed amber ale, etc. As explained below at pp. 755–56, Heileman does not sell some variations to some distributors, making others the exclusive purveyors of in-vogue styles of beer. For example, Heileman does not sell Old Style Ice to Calumet.

5. In fact, as discussed below at pp. 754–55, the evidence suggests that when Central fails to do so Heileman revises the quantity schedule downward so that Central obtains the maximum discount.

*Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 313–14 (7th Cir.1994). A further consideration, often listed as a fourth factor, is whether granting the injunction serves the public interest. *Id.* at 314; *Securities and Exchange Commission v. Cherif,* 933 F.2d 403, 408 (7th Cir.1991); · *Roland Machinery Co. v. Dresser Industries Inc.,* 749 F.2d 380, 386–89 (7th Cir.1984).

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

The first threshold to cross is demonstration of a reasonable likelihood of success on the merits. This threshold is low, satisfied if a "plaintiff's chances are better than negligible. . . ." *Roland Machinery,* 749 F.2d 380, 387 (7th Cir.1984) (quoting *Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982)). For the purposes of assessing Calumet's likelihood of success the court confines its analysis to Calumet's Robinson–Patman § 2(a) claim.

As pertinent here, Robinson–Patman § 2 provides:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* that nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . .

(b) . . . *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case . . . by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor . . .

15 U.S.C. § 13.

■ To prove that Robinson–Patman § 2(a) has been violated a plaintiff must establish six elements: 1) a different selling price ("price discrimination"); 2) to buyers purchasing from the same seller; 3) for commodities; 4) of like grade and quality; 5) where any sale or sales involved were "in commerce;" and 6) where such price discrimination may substantially injure competition. *Century Hardware Corp. v. Acme United Corp.,* 467 F.Supp. 350, 354 (E.D.Wis.1979).

Unquestionably, Heileman is the "same seller" to Calumet and Central. For the purpose **only** of determining Calumet's motion for a preliminary injunction, Heileman stipulates that the beverages it sells are commodities of like grade and quality, and that the sales involved are "in commerce." In addition, but again **only** for ruling on the motion for a preliminary injunction, Heileman stipulates that it relies on neither of the statutory defenses; *i.e.,* it is not granting an allowance for a difference in cost or attempting to meet a competitor's price.[6] Thus, an assessment of Calumet's chances of success on the merits focusses on only the first and last elements of the claim: Is Heileman selling at a "different price" and, if so, is there a chance of competitive injury?

Facts virtually identical to those in the present case were considered by the Supreme Court in *FTC v. Morton Salt Co.,* 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). On its sales of table salt, Morton offered to all purchasers a quantity discount of $.10 per case for carload-sized lots. In addition, those who purchased 5,000 cases in twelve consecutive months received an additional $.10 per

---

6. Heileman has reserved the right to pursue these defenses, and at the hearing contended it will need more time and discovery to do so. For this reason, and, more importantly, because Heileman is entitled to have a jury ultimately determine whether it has manipulated its quanti-

ty discount program to benefit only Central, see discussion below at pp. 754–55, Calumet's motion pursuant to Fed.R.Civ P. 65(a)(2) to consolidate the hearing with trial on the merits and enter a permanent injunction is **DENIED.**

case discount, and purchasers of 50,000 cases in twelve months received an additional $.05 per case discount.

The Supreme Court affirmed the FTC's finding that Morton's discount program violated Robinson–Patman § 2(a), concluding that Morton's "standard quantity discounts are discriminatory within the meaning of the Act, and are prohibited by it whenever they have the defined effect on competition."[7] *Morton Salt,* 334 U.S. at 44, 68 S.Ct. at 827. *Morton Salt* effectively creates a presumption that the "defined effect," *i.e.,* the possibility of an injury to competition, exists whenever a quantity discount is offered:

> It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a "reasonable possibility" that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers. This showing in itself is sufficient to justify our conclusion that the Commission's findings of injury to competition were adequately supported by evidence.

*Id.* at 50–51, 68 S.Ct. at 830; *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 559, 110 S.Ct. 2535, 2544, 110 L.Ed.2d 492 (1990) ("In *FTC v. Morton Salt Co.,*[ ] we held that an injury to competition may be inferred from evidence that some purchasers had to pay their supplier 'substantially more for their goods than their competitors had to pay.'" [citation omitted]).

The discount system described in *Morton Salt* is virtually indistinguishable from Heileman's quantity discount program, which would seem to (and, as will be explained, does) show Calumet has a plausible chance of success on the merits. Heileman disagrees, however, presenting essentially two arguments.

First, Heileman relies on the defense of "functional availability," derived from a body of case law that interprets *Morton Salt* to

indicate that "[t]he practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson–Patman violation if the concessions are available equally and functionally to all customers." *Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1326 (6th Cir.1983).

The evidence shows (and the court finds) that Calumet had the ability, in terms of cash and warehouse space, to purchase enough beer to obtain the maximum discount. Heileman argues that this makes the discount functionally available to Calumet; *i.e.,* Calumet's business decision not to purchase that quantity fails to give rise to a claim under Robinson–Patman § 2(a).

Second, Heileman contends that all of the preceding is irrelevant, because Robinson–Patman does not even apply in the present circumstances. The Twenty-first Amendment to the United States Constitution gives the states exclusive authority to regulate the importation and sale of alcoholic beverages within their borders. Heileman argues that Indiana law allows quantity discounts on wholesale sales of alcoholic beverages, and, as that is an aspect of the sale of alcoholic beverages reserved to the state's domain by the Twenty-first Amendment, Heileman is immunized from a Robinson–Patman § 2(a) violation.

For the reasons explained below, neither of these contentions persuade the court that Calumet's chance of success on the merits is dim.

#### a. Functional Availability Defense

The defense of "functional availability"—a phrase found nowhere in the statute—is, where quantity discounts are concerned, nothing more than judicial recognition that "cheaper by the dozen" is a too well-accepted practice of commerce to be anti-competitive in every instance. "That quantity discounts are covered by the Act, and prohibited **when they have the requisite effect on competition,** has been firmly established since our

---

7. The Court did so by reversing the Court of Appeals, and the Court made minor modifica-

tions to the FTC's order.

754

decision in *FTC v. Morton Salt*[ ]." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 249 n. 7, 113 S.Ct. 2578, 2601 n. 7, 125 L.Ed.2d 168 (1993) (J. Stevens, dissenting) (emphasis added).

■ Because, in practical terms, an inference of competitive injury arises from any quantity discount, *Texaco,* 496 U.S. at 559, 110 S.Ct. at 2544, quantity discounts are free of an anti-competitive effect only when all buyers may take advantage of them. As explained by a leading commentator:

> The discounts, offsets, or allowances a seller offers must be practically, rather than ostensibly, available to all of a seller's customers. If a court finds that concessions are not realistically available to all of a seller's purchasers, it will conclude that such concessions create lower prices for selected customers and, as such, are actionable discriminations within the meaning of Section 2(a).

16C von Kalinowski, BUSINESS ORGANIZATIONS § 29.15 at p. 29–160 (Rel. 95–9/94). In short, "if the lower price is available to all purchasers, not only in theory but in fact, *FTC v. Morton Salt Co.,* [ ], there is no violation of § 2(a)." *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1025–26 (2d Cir. 1976).

■ There is ample evidence from which it can be concluded, at this preliminary stage, that Heileman's discounts were only theoretically, but not actually, available to Calumet. First, the record shows that on numerous occasions, after the close of business for the month, Heileman changed the quantity that had been announced as that necessary to obtain the maximum discount, reducing it to a smaller quantity. The months in which this reduction was made were months in which Central did not purchase enough beer to obtain the maximum discount. The downward quantity adjustment in these cases would be to an amount slightly less than the amount of beer that Central did buy, giving it the discount.

For example, in one case the downward adjustment was to precisely the amount Central purchased. Heileman's September 1, 1992, bulletin announced that purchases of at least 75,000 cases in the month of October would qualify for the maximum discount of $.50. On November 13, 1992, a credit memo Heileman issued to Central reflected that Central was to receive a $.35 discount for 74,757 cases. A month later, however, Heileman issued a second credit memo to Central for a discount of $.15 for the same 74,757 cases, resulting in Central receiving a $.50 total discount.

Heileman offers an alternative explanation, that an additional October order by Central that would have put Central over 75,000 cases had to shifted into November because Heileman had "production problems;" thus, because Central's failure to purchase 75,000 cases was Heileman's fault, Central was given the credit. In a like manner Heileman is able to offer an explanation for every case in which an after-the-fact adjustment resulted in Central obtaining the maximum discount. These explanations are not entirely convincing, however, and the picture as a whole raises an inference that "creative accounting" was used to benefit Central.

These retroactive quantity adjustments in effect resulted in a secret discount that only Central could obtain, since Calumet had no way of knowing in advance the actual purchase amount that would qualify for the maximum discount. Moreover, to the extent that the downward quantity adjustments were designed to benefit only Central, they are blatantly discriminatory, casting doubt on Heileman's contention that the program is offered in good faith to all buyers. The retroactive downward adjustments are reason alone to find that the quantity discount program was not functionally available to Calumet.

Even were Heileman's discount program not administered in a discriminatory fashion, the court has serious doubts that it can be viewed as functionally available to Calumet or any of Heileman's customers other than Central. As von Kalinowski explains, "the approach taken by the courts is that an actionable discrimination results when a concession is based upon the purchase of a quantity so large that only a few of the seller's customers can actually obtain the concession." 16C von Kalinowski, BUSINESS ORGANIZATIONS § 29.15 at p. 29–161 (Rel. 95–9/94).

In the present case, documents produced by Heileman referred to as "AFE"s (an acronym for "authority for expenditure"), Calumet's (group) hrg. ex. 64, indicate that the quantity discount program levels are set each month based on the assumption that only one beer wholesaler will attain the maximum discount.

Each AFE contains an estimate of Heileman's cost for the planned quantity discount structure for a particular month; *i.e.,* the total amount that will be credited to wholesalers in the form of quantity discounts. For example, the AFE for May 1994 (the final page of group ex. 64) shows a $.50 discount available for purchases of 125,000 or more cases. Obviously, were two wholesalers to qualify for the maximum discount in May, the program would cost at least $125,000. The estimate shown on the AFE, however, is $78,000. Every AFE produced reveals the same: Heileman expected that only one wholesaler would purchase enough beer to obtain the maximum discount.

Moreover, the evidence tends to discount Heileman's contention that it would be a reasonable business decision for Calumet, because of its physical storage capacities and economic resources, to purchase enough beer to obtain the maximum discount. Heileman argues that Calumet does not do so because it has decided to maximize sales of competing brands, such as Anheuser–Busch, rather than aggressively promoting sales of Heileman products. According to Heileman, Calumet should compete with Central by structuring its purchases: obtaining the maximum discount by buying more than a month's supply of beer, warehousing it, and then selling from inventory in the following month(s).

Nothing in the Robinson–Patman Act or the cases interpreting it suggests that Calumet's decision to emphasize other brands and remain a (relatively) small seller of Heileman products *ipso facto* means Heileman may charge Calumet a higher price:

> The legislative history of the Robinson–Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson–Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of a seller's good faith effort to meet a competitor's equally low price.

*Morton Salt,* 334 U.S. at 43, 68 S.Ct. at 826.[8]

Furthermore, even taking the contrary view, that Calumet does not need the protection of § 2(a) because its financial strength would allow it to match Central's quantity buying power, other Heileman practices would hamstring that effort. While Heileman contends that Calumet should simply buy more of its product, Heileman handicaps Calumet by limiting the array of product choices available to Calumet. As Heileman, like other brewers, has engaged in brand extension by offering different styles of beer in the Old Style "family," it has allowed Central, but not Calumet, to purchase them. For example, Central, but not Calumet, is currently allowed to purchase "Old Style Draft" and "Old Style Ice."

This directly and indirectly hampers Calumet's ability to obtain the maximum quantity discount. The direct effect is the lost sales of "Ice" and "Draft" that would count towards the quantity necessary to obtain the discount. The indirect effect is the probable but hard-to-quantify lost sales of the Heileman products Calumet does carry ("regular" Old Style, "Light" and "L.A."), to retailers who wish to obtain Old Style "Ice" and "Draft" but have to order from someone other than Calumet and find it more convenient to obtain all their Heileman products in that order. Thus, Heileman expects Calumet to compete with Central on a non-level playing field, where Heileman's refusal to sell certain products to Calumet creates the tilt.

Also countervailing Heileman's argument that the discount is functionally available to

---

**8.** This portion of *Morton Salt* suggests, if "except to the extent" is emphasized, that the case could have been interpreted as limiting defenses to a § 2(a) violation to those enumerated in the statute. The cases have not done so, however.

Calumet because Calumet could simply buy more product is Heileman's policy on freshness. Heileman recommends that its wholesalers maintain only a twenty-day supply of product in inventory, as Heileman wants beer "sold-through" to the consumer within 120 days of its manufacture. Wholesalers are expected to destroy, at their cost, beer which is older. As a practical matter, beer in the wholesaler's inventory for longer than sixty days must be discounted to move it quickly to retailers and into the consumer's hands.

Were Calumet to purchase the quantity of beer necessary to obtain the maximum discount, for example, 150,000 cases in April and May, 1994, in effect the quantity of Old Style products available in Northwest Indiana would double (assuming no change in Central's purchase level). The record offers no reason to believe that the market has enough elasticity to absorb this quantity of Heileman products.

Indeed, Nick Sever, Central's President, indicated when deposed that even if Heileman increased the maximum discount available to him he would not buy more beer because he thought it unlikely that he would be able to sell more. Thus, were Calumet and Central both to purchase the quantity of beer necessary to obtain the maximum discount, as Heileman advocates, one or both would be at risk of violating Heileman's freshness policy and so forced to assume the cost of destroying beer. Calumet's decision not to take this risk is a reasonable business decision, making Heileman's maximum quantity discount not functionally available to it.

For these reasons it does not appear that Heileman's quantity discount program is realistically available to Calumet, or any Indiana wholesaler other than Central. Instead, it appears that the program is structured so that only one buyer, currently Central, would ever be able to obtain the maximum discount at a given time. As a result, the functional availability defense is not available to Heileman, and its quantity discount program is a price discrimination actionable under Robinson–Patman § 2(a).

### b. Twenty-first Amendment Defense.

Section 2 of the Twenty-first Amendment provides, as pertinent here, that "transportation or importation into any State ... for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." Early cases interpreting this language held, or at least strongly implied, that this insulated the states from any federal restriction of their power to regulate sale and distribution of alcoholic beverages within their borders.

For example, in *State Board of Equalization v. Young's Market Co.,* 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936), a California license fee required to import beer from outside the state was attacked as discriminating in favor of domestically-produced beer, thereby violating both the Commerce and Equal Protection Clauses. The Court upheld the fee, observing that the Twenty-first Amendment gave California the power to totally prohibit the importation of alcohol. Thus, the lesser prohibition effected by imposing a discriminatory tax was also protected by the Amendment. *Young's Market,* 299 U.S. at 63, 57 S.Ct. at 78–79.

As Twenty-first Amendment analysis has been refined over the years, however, it has become "by now clear that the Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause." *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 275, 104 S.Ct. 3049, 3057, 82 L.Ed.2d 200 (1984). Thus, in *Bacchus* the Court invalidated a Hawaii tax that discriminated in favor of domestically-produced liquor that was, as the dissenters recognized, indistinguishable from the California tax in *Young's Market. Bacchus,* 468 U.S. at 282–83, 104 S.Ct. at 3061–62.

*Bacchus,* quoting prior precedent, explains that the relevant inquiry is "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Bacchus,* 468 U.S. at 275–76, 104 S.Ct. at 3057, *quoting Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 714, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984).

"State laws that constitute mere economic protectionism are therefore not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor." *Bacchus*, 468 U.S. at 276, 104 S.Ct. at 3058.

Against this background, Heileman contends that Ind.Code § 7.1–5–5–7 insulates its quantity discount from attack under Robinson–Patman § 2(a). This statute makes it unlawful for a person permitted to sell alcoholic beverages destined for retail in Indiana "to discriminate between purchasers by granting a price, discount, allowance, or service charge which is not available to all purchasers at the same time." *Ibid.* An Indiana appellate court has held that the statute allows quantity discounts, and, because it is not analogous to Robinson–Patman § 2, does not require that the discounts be "functionally available:"

> The argument that not all purchasers can afford to purchase larger quantities does not support an argument of discrimination. The discount is available to the small quantity purchaser, but such purchaser lacks the economic resources to take advantage of the discount. A requirement of functional availability invites this court to discriminate against those purchasers with sufficient economic resources to buy the larger quantities, thus, prohibiting greater discounts. Such a requirement is merely a request to limit competition.

*Lake County Beverage Co. v. 21st Amendment, Inc.*, 441 N.E.2d 1008, 1013 (Ind.Ct. App.1982) (footnote omitted).

While Calumet argues that the Indiana statute permits quantity discounts only at the wholesaler-to-retailer level, and not for brewer-to-wholesaler sales, the court assumes for the purposes of present analysis (as appears ultimately correct) that the statute allows quantity discounts at both levels. Thus, *Lake County Beverage's* view that a functional availability requirement limits competition[9] is at odds with the Supreme Court's view that it is "self-evident . . . that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers." *Morton Salt*, 334 U.S. at 50–51, 68 S.Ct. at 830–31.

Heileman argues that under these circumstances it is necessary to weigh Indiana's interest in using quantity discounts to promote competition among wholesalers against the federal interest expressed in Robinson–Patman § 2 to foster competition by protecting small businesses. *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 346–351, 107 S.Ct. 720, 726–29, 93 L.Ed.2d 667 (1987). Were that in fact necessary at this stage of the case, it should be noted that there is an absence of evidence in the record to substantiate *Lake County Beverage's* contention that quantity discounts promote competition even when not functionally available. This would perhaps doom the state interest, even though Calumet is not the prototypically small business meant to be protected by the federal statute. *See Duffy*, 479 U.S. at 350, 107 S.Ct. at 729; *California Retail Liquor Dealers Assoc. v. Midcal Aluminum*, 445 U.S. 97, 114, 100 S.Ct. 937, 947, 63 L.Ed.2d 233 (1980).[10]

■ In this preliminary holding it is not necessary to go that far, however. While refusing to read a functional availability requirement into the statute, *Lake County Beverage* nevertheless allowed that some discounts could be discriminatory:

**9.** The court's reasoning in *Lake County Beverage* depended in part on its conclusion (derived from a Department of Justice study) that Robinson–Patman § 2 is "ineffective and irrelevant to the protection of small businesses" and "in disfavor with its administering agency." 441 N.E.2d at 1013, 1014. This court, however, has a duty to apply the law Congress enacted, not the law Congress or an administrative agency believes should have been enacted. *Cf. NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 294 (7th Cir.1992).

**10.** Despite Heileman's contention otherwise, it is also relevant that the Indiana statute does not require quantity discounts or involve the state in supervising them. A state law which authorizes an anti-trust violation does not immunize the violator. *Midcal*, 445 U.S. at 106, 100 S.Ct. at 943. (The state supervision requirement has been abandoned for municipal actors. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985)).

There is no evidence to infer that [the quantity discount under consideration] was formulated in such a manner that only selected purchasers could qualify for the discounts. If there existed any evidence of such a system, the result of this case could be different.

*Lake County Beverage,* 441 N.E.2d at 1013 n. 4. As explained above in discussing Heileman's functional availability defense, there is evidence in the record supporting at least a preliminary inference that Heileman structured its discount system intending that only one purchaser would qualify for the maximum discount, and on occasion manipulated the system to benefit a specific purchaser, Central.

As a result, the court need not find Indiana's method (as explained in *Lake County Beverage*) of enhancing competition invalid. If, as the evidence suggests, Heileman's program was structured to benefit a selected purchaser, the potential conflict between state and federal law dissolves. For this reason, the court finds that Heileman's Twenty-first Amendment defense does not impact upon Calumet's chances of success on the merits.

## II. REMAINING FACTORS IN PRELIMINARY INJUNCTION ANALYSIS

Under the Seventh Circuit's "sliding scale" approach, as a movant's likelihood of success increases, its burden of proof on the remaining factors decreases. *Storck,* 14 F.3d at 314. To make explicit what the court has endeavored above to explain, Calumet appears to have a more than marginal chance of success on the merits. As a result, the remaining factors may be dealt with summarily.

In order to show that no adequate legal remedy exists, Calumet must show that an award of damages at the end of a trial on the merits is inadequate. This does not mean that damages must be shown "wholly ineffectual," but instead "seriously deficient as a remedy." *Roland Machinery,* 749 F.2d at 386. This is true if the nature of the loss makes damages difficult to calculate, often

the case when attempting to measure lost profits. *Id.*

■ Calumet has offered evidence that, since the inception of the quantity discount program, its sales of Heileman products have decreased approximately 45%. During the same time period, Central's sales have increased. Calumet attributes the loss to its inability to compete with Central on price. During this period Calumet has also suffered declining sales of other brewer's products. Calumet contends this loss is related to its lost Heileman sales, because losing a customer's Heileman purchases often means losing the customer's business altogether.

Heileman simply contends that damages are an adequate remedy in this case. However, in arguing that Calumet has failed to prove that the quantity discount program has caused it a competitive injury, Heileman contends that "Calumet's own poor business practices are the cause of any down turn [sic] in Calumet's business," and that there are "simply too many factors bearing on the decline in Calumet's sales to justify blaming them on Heileman." Heileman's Proposed Conclusions of Law, par. 31. Heileman thus admits the essential flaw with a damages remedy in this case: should Calumet ultimately succeed on the merits, calculating the monetary harm that Heileman has (allegedly) caused will be exceptionally difficult. For this reason, the court believes that damages are an inadequate remedy.

When, as here, a plaintiff seeks preliminary and permanent injunctive relief, irreparable harm exists if the plaintiff cannot "easily wait till the end of trial to get that relief." *Roland Machinery,* 749 F.2d at 386. Because Calumet will continue to lose profits, and, more importantly customers and good will, in the interim between now and trial on the merits, its harm is irreparable.

This is true despite Calumet's delay in filing suit, which Heileman argues proves no irreparable harm exists. Calumet waited seven years from the inception of the quantity discount program to file suit, so Heileman argues Calumet certainly can afford to wait longer for an injunction.

The evidence shows, however, that Calumet has not "slept on its rights," but since the program began has protested and worked with Heileman to settle the disagreement without resorting to litigation. By filing suit Calumet indicates that it has abandoned that effort and can wait no longer. Considering the expense and uncertainties of litigation, and growing favor for "alternative dispute resolution," under these circumstances the court believes it would be inappropriate to find that Calumet's delay in filing suit is an admission that it will suffer no further irreparable harm.

The court must also consider the balance of harms to the parties and whether granting the injunction serves the public interest. The harm to Calumet from denying the injunction has been adequately explained. Heileman argues that it will be harmed more by granting the injunction, however, because the quantity discount program is the only marketing strategy it has found successful to compete against Anheuser–Busch and Miller Brewing, who have a combined share of 70.9% of the Indiana market. This contention necessarily implies that an injunctive halt to the quantity discount program would require Heileman to sell at its full un-discounted price.

Heileman's argument that Calumet should simply buy enough beer to obtain the maximum discount mitigates against this contention. Obviously, Heileman is willing to sell large quantities of beer at a fully-discounted price. Were Heileman to offer all Indiana wholesalers a discounted price, which it is free to do, the net effect would be practically the same as if Calumet and Central both obtained the maximum discount. Alternatively, a quantity discount program that is realistically available to all wholesalers could be offered. Thus, the court finds Heileman's explanation of how it will be harmed counterintuitive.

Moreover, Heileman's argument of great harm from the granting of an injunction can be said to prove too much. An entity that acts in violation of the anti-trust laws presumably does so to benefit its own business interests. Discontinuing the quantity discount program may in fact harm Heileman's interests, but if the program violates the anti-trust laws, as appears to be the case, that is not only necessary, but just. Having said that, it is obvious that entering a preliminary injunction designed to give effect to Robinson–Patman § 2(a) serves the public interest.

For the reasons given, Calumet's motion for a preliminary injunction is **GRANTED**. Heileman is **ORDERED** to immediately discontinue its present discriminatory pricing structure.

**SO ORDERED.**